IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COMPUCOM SYSTEMS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 09-173-SLR |
| | ) |
| GETRONICS FINANCE | ) |
| HOLDINGS B.V., | ) |
| | ) |
| Defendant. | ) |

Anne Shea Gaza, Esq., Frederick L. Cottrell, III, Esq., and Stephen M. Ferguson, Esq., of Richards, Layton & Finger, P.A., Wilmington, Delaware. Attorneys for Plaintiff.

Jennifer C. Voss, Esq., of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. Attorney for Defendant.

**MEMORANDUM OPINION**

Dated: July 22, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Compucom Systems, Inc. ("Compucom") filed this action on March 13, 2009, against defendant Getronics Finance Holdings B.V. ("Getronics"). Compucom is seeking damages resulting from a breach of contract arising from Compucom's purchase of Getronics' North American operations. Specifically, Compucom alleges that Getronics breached the purchase agreement ("the Agreement") by failing to indemnify Compucom for losses stemming from Getronics' breach of warranty of certain financial statements. (D.I. 2 at ¶¶ 44-49) Getronics has initiated arbitration proceedings with Compucom to determine the accuracy of net working capital as described and defined in the financial statements and the Agreement. (D.I. 10 at 9)

Compucom is a Delaware corporation with its principal place of business in Dallas, Texas. (D.I. 2 at ¶ 8) Getronics is a *Besloten Vennootschap* organized under the laws of the Netherlands with its principal place of business in the Netherlands. (*Id.* at ¶ 9) This court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Compucom and Getronics and the amount in controversy exceeds $75,000. In addition, venue in this court is appropriate because Getronics has contractually consented to personal jurisdiction and venue in the Agreement. (*Id.* at ¶ 11) Currently before the court is Getronics' motion to dismiss or stay proceedings pending the completion of arbitration. For the reasons stated below, Getronics' motion to stay this suit pending completion of arbitration will be granted.

## II. BACKGROUND

### A. The Transaction

Getronics N.V., the parent company of Getronics, is an international supplier of information and communications technologies and services. (*Id.* at ¶ 12) In early 2008, Getronics N.V. began negotiations to sell its North American operations, consisting of Getronics USA, Inc., Getronics Canada, Inc., and ISC Bunker Ramo de Mexico, S.A. de C.V. (collectively, "Getronics North America" or "GNA"), to Compucom. (*Id.* at ¶ 26)

GNA is in the business of repairing and servicing computers and other equipment at large retail stores. (*Id.* at ¶ 13) After a service request is made by a client, GNA will replace the client's damaged equipment with spare parts from inventory. (*Id.* at ¶ 14) GNA keeps the damaged equipment, repairs it and, once in working condition, adds it to the spare parts inventory to be used to replace malfunctioning equipment at a later date. (*Id.*) Spare parts are used in this cycle until they are no longer capable of being repaired or become technologically obsolete. (*Id.*)

Ordinarily, for accounting purposes, inventory is recorded as an asset after it is purchased and expensed to the income statement once the inventory is actually used. (*Id.* at ¶ 15) GNA uses a different method of accounting for inventory, since the spare parts are repaired and reused, in which spare parts are amortized over their estimated useful life. (*Id.* at ¶¶ 15-17) Under GNA's accounting practices, the spare parts inventory expense incurred each year has a direct effect on the level of earnings reported for that year. (*Id.* at ¶ 17) Thus, the length of estimated useful life on spare parts directly affects reported earnings. Assigning a short useful life to spare parts

2

means that inventory is expensed more quickly which results in lower earnings for a particular year, while a longer useful life has a smaller negative effect on earnings for a given year.

When GNA adopted this accounting method in 2002, it assigned a useful life of two years to spare parts inventory. (*Id.* at ¶ 19)  GNA changed this useful life estimate to three years in July 2005, and then again to six years in November 2006. (*Id.* at ¶ 20) Compared to financial statements using a two-year useful life, these changes resulted in a decrease in spare parts expenses recorded and a corresponding increase in earnings and inventory recorded for 2005, 2006, and 2007. (*Id.* at ¶ 21)

In order to provide financial information to prospective buyers, Getronics N.V. employed PricewaterhouseCoopers ("PwC") to prepare a vendor due diligence report (the "VDD Report") containing financial information for GNA from 2005 through 2007. (*Id.* at ¶ 24)  Although the VDD Report did note that inventory was depreciated over a six-year period and that the change to six years may have resulted in a surplus value in inventory (D.I. 11, ex. 1 at 2-3), the VDD Report did not quantify the potential difference nor did it comment on the appropriateness of using a six-year useful life for inventory. (D.I. 2 at ¶ 25)

At the time that Getronics N.V. was negotiating the sale of GNA to Compucom, no audited financial statements existed for GNA because it operated as a part of Getronics N.V. and not as a stand-alone business. (*Id.* at ¶ 27)  This was problematic for Compucom because it had a contractual obligation to provide its bondholders with an audited financial statement if it purchased GNA. (*Id.*)  Compucom also desired an

audited financial statement to ensure the accuracy of the VDD Report. (*Id.*) Although it is unclear which party commissioned PwC to perform the audit, PwC did not complete the audited statements prior to the closing and, thus, the VDD Report was the main source of financial information relied upon in the sale.

On June 21, 2008, Compucom signed the Agreement to purchase Getronics North America for $205 million subject to pre- and post-closing price adjustments. (*Id.* at ¶ 32) The Agreement contained, inter alia, a warranty clause, an indemnification clause, and procedures for the parties to determine the final purchase price along with an arbitration clause allowing for the resolution of price disputes.

### B. Post-Closing Price Adjustments and Arbitration Clauses

The Agreement contained detailed instructions for both parties to exchange information in a prescribed manner in order to reach a consensus on the final purchase price. If the parties could not agree to a final purchase price after a specified period, the Agreement provided that any remaining disputes be submitted to KPMG International ("the Accounting Firm") to make a final and binding resolution of any objections to the purchase price. Specifically, prior to closing the sale, Getronics was required to submit a calculation of the estimated purchase price. (D.I. 2, ex. A at 14) This purchase price included an estimate of net working capital, which the Agreement defined as the net book value of GNA's current assets minus its current liabilities at the time of the closing. (*Id.* at 10) This number was to be determined in accordance with International Financial Reporting Standards ("IFRS") consistently applied to Exhibit E of the Agreement. (*Id.*) Exhibit E listed the items included under the net working capital

calculation, one of which was inventory, and provided that those items "shall be computed in a manner consistent with the Financial Information." (*Id.* at ex. E) The "Financial Information" was defined in the Agreement as "[t]he historical financial information contained in the VDD Report (together with the Interim Income Statement...)." (*Id.* at 18)

Within sixty days of the closing date, Compucom was required to provide Getronics with a proposed purchase price calculation which included a calculation of net working capital. (*Id.* at 14-15) Getronics then had thirty days to examine Compucom's proposed purchase price calculation and issue a written purchase price dispute notice if Getronics disagreed with items in Compucom's proposed calculation. (*Id.* at 15) Once a purchase price dispute was issued, the Agreement provided for a thirty-day period for both parties to attempt to resolve the dispute in good faith. (*Id.*) Finally, if the parties were unable to reach a resolution of the disputed items, the disputed items were to be submitted to the Accounting Firm which would be required to render a final and binding determination regarding the disputed items within forty-five days of referral to the firm. (*Id.*) The arbitration clause was limited to two types of disputes: "disagreements based on mathematical errors or the Proposed Purchase Price Calculation not being calculated in accordance" with the Agreement. (*Id.* at 16)

Prior to closing the deal, Getronics provided Compucom with an estimate of net working capital, including the value of GNA's spare parts inventory. (D.I. 10 at 5) The deal was subsequently closed on August 20, 2008. (*Id.* at 6) On October 20, 2008, Compucom provided Getronics with a proposed purchase price calculation. (*Id.*

5

at 7) On November 5, 2008, Compucom confirmed that it used a four-year estimated useful life for spare parts inventory as opposed to the six-year useful life that GNA had previously used. (D.I. 23 at 4) This two-year difference in useful spare parts life led to a $4.3 million difference between Getronics' estimate of net working capital and Compucom's calculation of net working capital. (*Id.*) After Getronics and Compucom failed to resolve this discrepancy, on December 19, 2008, Getronics issued a purchase price dispute notice to formally dispute Compucom's calculation of the net working capital. (D.I. 10 at 8) The dispute specifically centered on the spare parts inventory valuation within the net working capital calculation.

Getronics and Compucom had a number of communications following the dispute notice, including a letter from Compucom to Getronics, sent February 5, 2009, agreeing to waive the thirty-day time limit between the dispute notice and submission of disputed items to the Accounting Firm, agreeing that "[e]ither the Buyer or the Sellers may instead submit any disputed items to the Accounting Firm at any time that is at least 10 day [sic] after one of them has provided written notice to the other of its desire to submit the disputed items to the Accounting Firm." (D.I. 11, ex. 4) Although discussions to this point focused on the accounting dispute, breach of contract and failure to indemnify became a topic of discussion before Getronics commenced arbitration on March 13, 2009 and Compucom filed the current suit later that day. While Getronics claims that the first mention of any breach of representations and warranty occurred in a letter from Compucom dated March 10, 2009 (D.I. 23 at 5), Compucom alleges that it sent a draft complaint and a draft letter formally documenting its prior indemnification demand to Getronics on March 6, 2009. (D.I. 20 at 11)

### C. Financial Information Warranty and Indemnification Clauses

In the Agreement, Getronics expressly represented and warranted the financial information in the VDD Report. Specifically, the relevant portion of Article III of the Agreement provided that:

> The sellers have made (i) the VDD Report and (ii) the income statement for the three months ended March 31, 2008... available to Buyer. The historical financial information contained in the VDD Report... and the Interim Income Statement were prepared from the books and records of the Acquired Companies, **which have been prepared in accordance with IFRS. The Financial Information fairly presents in all material respects the financial condition and results of operations of the Acquired Companies as of the dates and for the periods set forth therein**.

(D.I. 2, ex. A at 18) (alterations and emphasis added) Article VIII of the Agreement provided indemnification for Compucom if Getronics breached those warranties. The Agreement required that Getronics "shall indemnify, defend and hold harmless Buyer [Compucom] against all Losses incurred by Buyer arising out of or relating to... any breach of any representation or warranty of the Sellers [Getronics] in ARTICLE III...." (*Id.* at 57) Except for certain limitations not applicable here, the Agreement provided that "indemnification rights provided... shall be the sole and exclusive remedy available to the Parties with respect to any breach of the representations, warranties, covenants or agreements...." (*Id.* at 61)

### D. The Dispute

At some point following the closing on August 20, 2008, PwC completed the audit of GNA's financial statements for 2005, 2006, and 2007. (D.I. 20 at 9) Compucom alleges that extensive testing in connection with the audit led GNA to

conclude that it "should have been expensing spare parts inventory over **four years**, rather than **six years**." (*Id.* at 10) (emphasis in original) Compucom further alleges that Getronics N.V.'s Chief Financial Officer ("CFO") sent a letter to PwC "confirming the accuracy of the four-year useful life" and that "PwC also agreed with the decision to apply a useful life of no more than four years...." (*Id.*) Getronics responds to these accusations by claiming that they are inaccurate and lead to a faulty picture of what actually occurred. First, Getronics claims that GNA never, at any point, concluded that it should have been using a four-year useful life rather than a six-year useful life, pointing to Compucom's failure to quote or reference any document to support the statement. (D.I. 23 at 2) Second, Getronics asserts that PwC never independently agreed with the decision to use a four-year useful inventory life, pointing to PwC's fundamental role of reviewing business decisions of management and assessing if those decisions are reasonable. (*Id.* at 2-3) Getronics further asserts that the audit was prepared pursuant to U.S. Generally Accepted Accounting Principles ("GAAP"), as required for Compucom's bondholders, rather than IFRS, the standard of accounting upon which the Agreement was based. (*Id.* at 3) As a result, Getronics claims that PwC merely stated that Compucom's decision to apply a four-year useful life was reasonable under GAAP standards and never stated that a six-year useful life was unreasonable. (*Id.*) Lastly, Getronics claims that the letter from its CFO to PwC in connection with the audit simply confirmed that the spare parts inventory, under Compucom's decision as new management, was "recorded in the financial statements

8

[] based on an amortized purchase cost spread over 3-4 years." (*Id.*) (alterations in original).

Compucom maintains that the accounting practice of a six-year useful inventory life brings about two distinct issues under the Agreement. The first issue, which is the basis of this lawsuit, is whether the financial information in the VDD Report was not "fairly presented and in accordance with IFRS" and, thus, in violation of the warranty clause. (D.I. 20 at 10) The reasoning is that, by using a six-year life instead of a four-year life, Getronics understated GNA's expenses, leading to overstated earnings and an inflated purchase price. Although it is not clear how Compucom arrived at this number, it claims that the breach of these representations of financial information led to losses in excess of $32 million. (*Id.* at 10-11) The second issue Compucom cites is whether the useful inventory life span that Getronics used caused an artificially high inventory value in calculating the purchase price and, as a result, the post-closing price adjustments must be shifted to reflect a four-year useful life of inventory. Conversely, Getronics argues that the dispute, whether couched in terms of breach of warranty or price adjustments, boils down to the single issue of the appropriateness of a six-year inventory life span which is an issue that should be resolved through arbitration by the Accounting Firm.

## III. STANDARD OF REVIEW

Getronics has moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) or, in the alternative, for a stay pending completion of arbitration. The Third Circuit has suggested that 12(b)(6) is the more proper rule used to seek dismissal of an action if that action is covered by an arbitration provision. *See Nationwide Ins. Co. of Columbus v. Patterson*, 953 F.2d 44, 45 n.1 (3d Cir. 1991). This court has reasoned that seeking dismissal under 12(b)(1) would be inappropriate in such a situation "because the existence of a valid arbitration clause does not technically deprive the Court of subject matter jurisdiction. It instead requires the Court to forego the exercise of jurisdiction in deference to the parties' contractual agreement to address in another forum those disputes which fall within the scope of the agreement to arbitrate." *Liveware Publ'g, Inc. v. Best Software, Inc.*, 252 F. Supp. 2d. 74, 78-79 (D. Del. 2003). Whether a party invokes Rule 12(b)(1) or 12(b)(6), "on a motion requesting the Court to defer to arbitration, the Court's attention is not generally directed in the first instance at dismissal but rather at the propriety of a stay." *Id.* (citing 9 U.S.C. § 3).

The Federal Arbitration Act ("FAA") mandates that district courts shall stay proceedings while arbitration is pending if a suit is brought "upon any issue referable to arbitration under an agreement in writing for such arbitration" and the court is "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement...." 9 U.S.C. § 3. The FAA limits the role of courts to determine: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the specific dispute falls within the scope of the agreement. *John Hancock Mutual Life Ins.*

Co. v. Olick, 151 F.3d 132, 136 (3d Cir.1998). In conducting this review, the court should apply the ordinary principles of contract law. See 9 U.S.C. § 2. Although courts generally operate under a pronounced "presumption of arbitrability," Battaglia v. McKendry, 233 F.3d 720, 725 (3d Cir.2000) (quoting AT & T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986)), the Third Circuit has held that this presumption does not apply in all circumstances. See Local 827, Intern. Broth. Of Elec. Workers v. Verizon New Jersey, Inc., 458 F.3d 305, 310 (3d Cir. 2006). If parties draft an arbitration clause narrowly, the court "cannot presume, as [it] might if [the arbitration clause] were drafted broadly, that the parties... agreed to submit all disputes to arbitration." Id. (quoting Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 888 n.5 (3d Cir.1992)).

## IV. DISCUSSION

If two parties enter into a valid agreement and a specific dispute falls within the scope of an arbitration clause in that agreement, public policy favors the enforcement of the arbitration clause. In the case at bar, it is not disputed that the parties entered into a valid arbitration agreement when they executed the Agreement. Therefore, the court must first determine whether the arbitration clause in the Agreement is broad or narrow.

Broad arbitration provisions are generally defined as those that apply to any dispute arising from an agreement. See Trap Rock, 982 F.2d at 888 n.5. Narrow arbitration provisions, on the other hand, have been found to "expressly limit the range of arbitrable disputes to a single category or function." Id. The arbitration clause here mandates that the arbitrator "shall... limit its review to whether the Proposed Purchase

11

Price Calculation contained mathematical errors or whether the Proposed Purchase Price Calculation was calculated in accordance with this Agreement...." (D.I. 2, ex. A at 16) Although the parties argue over the exact breadth of the arbitrator's authority, specifically regarding what documents the arbitrator may review and certain limits on values the arbitrator may assign to items, taken as a whole, the arbitration provision is narrow. Far from clauses that direct parties to arbitrate any and all matters arising from a contract agreement, the clause here directs parties to arbitrate only in two limited circumstances. Bolstering the case for this classification as narrow is that the limited circumstances are exceptions to a general dispute resolution clause which provides that "[a]ny Claim against any Party to this Agreement arising out of or relating to this Agreement shall be brought in [federal or state court in Delaware]." (*Id.* at 65)

With the backdrop of the narrow arbitration clause in mind, the court turns its focus to "the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.* 247 F.3d 44, 55 (3d Cir. 2001) (internal quotations omitted). While Compucom labels this dispute as an indemnification issue, for which the Agreement clearly mandates litigation in a Delaware court, Getronics poses the issue as a dispute over the accounting valuation of net working capital.

Under the Agreement, arbitration is appropriate to resolve disputes over whether "the Proposed Purchase Price Calculation," including the estimated net working capital, was calculated based on the financial information contained in the VDD Report and consistent with IFRS. Regardless of what legal theory the parties assert, the focal point of the conflict is the propriety of using a six-year inventory life as opposed to a four-year

inventory life for spare parts in the preparation of financial statements relied upon in this transaction. The court recognizes that the above accounting issue relates to both the warranty of financial information and the post-closing price adjustments. Nevertheless, the FAA requires that, if a suit is brought in a district court "upon **any issue** referable to arbitration under an agreement in writing for such arbitration," the court must stay the proceeding pending arbitration. 9 U.S.C. § 3. (emphasis added). Just because a claim for indemnification itself cannot be referred to arbitration does not mean that an issue central to the resolution of an indemnification claim cannot be referred to arbitration. The FAA is explicit that if a claim is based on an issue that is arbitrable, the court must stay the proceeding.[1]

## V. CONCLUSION

For the reasons stated, Getronics' motion to stay proceedings pending completion of arbitration is granted. An appropriate order shall issue.

---

[1] If it is determined through arbitration that Getronics' use of the six-year inventory life was inconsistent with IFRS, the purchase price will be adjusted to accommodate the inflated number propounded by Getronics. Although it is not clear to the court what further relief is sought by Compucom through its indemnification claim, a brief stay to resolve the initial accounting issue is not likely to prejudice Compucom.

13