IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COMPUCOM SYSTEMS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. No. 09-173-SLR |
| ) | |
| GETRONICS FINANCE HOLDINGS ) | |
| B.V. and GETRONICS N.V., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM ORDER**

At Wilmington this 16th day of October, 2012, having reviewed the pending motions of defendants to dismiss the amended complaint for failure to state a claim, as well as the papers and oral argument submitted in connection therewith;

IT IS ORDERED that said motions (D.I 45, D.I. 48) are denied, for the reasons that follow:

1. **Background.** The dispute between the parties stems from the purchase in 2008 by plaintiff CompuCom Systems, Inc. ("CompuCom") of certain companies owned by subsidiaries of defendant Getronics N.V. ("Getronics"), a *Naamloze Vennootschap* organized under the laws of the Netherlands. The signatories to the Purchase Agreement memorializing the above transaction ("the Transaction") included CompuCom and the sellers, defendant Getronics Finance Holdings B.V. ("B.V. Holdings"), a *Besloten Vennootschap* organized under the laws of the Netherlands; Getronics US Operations, Inc. ("US Operations"), a Delaware corporation; and

Getronics Holding (Mexico), S. de R.L. de C.V. ("SRL Holdings"), a *sociedad de responsabilidad limitada* (collectively, "the Sellers").[1] (D.I. 52, ex. 1) The Purchase Agreement entered into by CompuCom and the Sellers provided, inter alia, that CompuCom pay approximately $205 million for GNA, the final purchase price to be subject to certain pre- and post-closing adjustments. (D.I. 6, ex. A)[2] The Purchase Agreement contained detailed instructions for both parties to exchange information in a prescribed manner in order to reach a consensus on the final purchase price. If the parties could not agree to a final purchase price after a specified period, the Purchase Agreement provided that any remaining disputes be submitted to KPMG International ("KPMG"), an accounting firm, to make a final and binding resolution of any objections to the purchase price. (D.I. 6, ex. A, § 2.3(b))

2. As noted, CompuCom acquired USACo through the above Transaction. USACo is in the business of repairing and servicing computer and other point-of-sale equipment at large retailers such as Target and The Home Depot. (*See* D.I. 40, ¶¶ 1, 15) To conduct its business, USACo maintains an extensive inventory of spare parts

---

[1] The companies acquired through the Transaction were Getronics Canada Inc., an Ontario corporation, the stock of which was owned by B.V. Holdings; ISC Bunker Ramo de Mexico, S.A. de C.V., a *sociedad anonima* organized under the laws of the United Mexican States, the stock of which was owned by B.V. Holdings and SRL Holdings; and Getronics USA Inc. ("USACo."), a Delaware corporation, the stock of which was owned by US Operations. These companies comprised the North American operations of the parent company, Getronics, and will be referred to collectively as "GNA" consistent with the parties' denotation.

[2] Because the copy of the Purchase Agreement attached as exhibit A to the amended complaint (D.I. 40) is incomplete, I will refer to the copy attached to the redacted version of the original complaint when referring to sections of the Purchase Agreement. (D.I. 6, ex. A)

2

that it uses to replace broken equipment. (*Id.*, ¶¶ 2, 16) USACo then repairs the damaged parts, if possible, and returns them to its spare parts inventory for future use. (*Id.*, ¶ 16)

3. The accounting treatment of USACo's spare parts inventory was addressed in the vendor due diligence report ("VDD Report") prepared by PricewaterhouseCoopers Transactional Services in connection with the Transaction. (*Id.*, ¶¶ 54-57) More specifically, the VDD Report disclosed that USACo's spare parts inventory was accounted for using a "cap pool" method that amortized the spare parts expense using a six-year useful life estimate. (*Id.*, ¶ 55)

4. Because GNA had historically operated as part of Getronics (the parent company), not as a stand-alone business, audited financial statements for GNA did not exist at the time of the negotiations. (*Id.*, ¶ 58) Therefore, CompuCom required the Sellers to provide representations and warranties in the Purchase Agreement regarding the accuracy of the financial information contained in the VDD Report. (*Id.*, ¶ 60; D.I. 6, ex. A, § 3.3(a)) In this regard, the Sellers represented and warranted to CompuCom that certain pre-closing financial information for the period 2005 through the first quarter of 2008 "fairly present[ed] in all material respects the financial condition and results of operations of [GNA] and was "prepared in accordance with [International Financial Reporting Standards ("IFRS")]." (*Id.*) Pursuant to § 8.3(a) of the Purchase Agreement, B.V. Holdings expressly agreed to indemnify CompuCom for any damages resulting from a breach of the representations and warranties in § 3.3(a). (*Id.*, ex. A, § 8.3(a))

5. Prior to closing, Getronics provided CompuCom with an estimate of net

3

working capital, including the value of USACo's spare parts inventory. Subsequent to closing, CompuCom provided Getronics with a proposed purchase price calculation and confirmed that it used a four-year estimated useful life for spare parts inventory as opposed to the six-year useful life that GNA had previously used. This two-year difference in useful spare parts life led to a $3.9 million difference between the parties' calculations. After Getronics and CompuCom failed to resolve this discrepancy, Getronics issued a purchase price dispute notice pursuant to the Purchase Agreement.

6. On March 13, 2009, CompuCom brought this action against B.V. Holdings (the named indemnitor) for breach of contract based on the Sellers' alleged failure to provide accurate financial statements.[3] (D.I. 1) At about the same time, the purchase price adjustment arbitration provision in the Purchase Agreement was invoked and the dispute over the spare parts inventory valuation was referred to KPMG. The litigation was stayed pending completion of arbitration. (D.I. 24; D.I. 25) The final determination report of KPMG issued in April 2011. (D.I. 46, ex. A)

7. Thereafter, CompuCom filed its amended complaint adding a fraud claim and Getronics as a party. CompuCom asserts in its amended complaint that, '[b]y erroneously accounting for inventory, the Sellers significantly understated GNA's expenses and, in turn, significantly overstated GNA's EBITDA. . . . [Because] EBITDA served as the basis for valuing the transaction, . . . CompuCom overpaid for GNA." (D.I. 53 at 5, citing D.I. 40, ¶¶ 3-5, 8, 73-85) Getronics and B.V. Holdings (collectively,

---

[3]CompuCom contends that it discovered documents in the possession of the acquired companies suggesting that GNA had switched from a two-year useful life to a six-year useful life in order to artificially inflate earnings. (D.I. 40, ¶¶ 67-68)

4

"defendants") have both filed motions to dismiss, asserting that CompuCom is precluded, as a matter of law, from relitigating KPMG's determination that, in accounting for spare parts inventory, using the historical estimate of a six-year useful life was reasonable.[4]

8. **Standard of review.** The Delaware Supreme Court has described the general rule of issue preclusion as follows:

> Collateral estoppel precludes a party who has litigated one cause of action from relitigating in a second cause of action matters of fact that were, or necessarily must have been, determined in the first action. A claim will be collaterally estopped only if the same issue was presented in both cases, the issue was litigated and decided in the first case, and the determination was essential to the prior judgment. The party asserting collateral estoppel has the burden of showing that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding.

*Proctor v. Delaware*, 931 A.2d 437, 2007 WL 2229013 (Del. Aug. 2, 2007). *Accord Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006).[5]

9. "When parties to an agreement decide that they will submit their claims to arbitration, Delaware courts strive to honor the reasonable expectations of the parties. . . . [However, t]he policy that favors alternate dispute resolution mechanisms . . . does not trump basic principles of contract interpretation." *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155-56 (Del. 2002). "In interpreting contract language,

---

[4] I note in this regard that the arbitration was between CompuCom and Getronics, the Sellers' parent company that has contended in this litigation that it was **not** "closely related" to the Purchase Agreement.

[5] In addition to the standard requirements for the application of collateral estoppel identified in *Proctor*, the Third Circuit also requires that "the party being precluded from relitigating the issue was fully represented in the prior action," a requirement not in dispute instantly. *Jean Alexander Cosmetics, Inc.*, 458 F.3d at 249.

5

clear and unambiguous terms are interpreted according to their ordinary and usual meaning. . . . When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create new contract rights, liabilities and duties to which the parties had not assented." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

10. **Analysis.** As noted above, the Purchase Agreement provided for a post-closing adjustment to the purchase price relating to changes between signing and closing in the financial statements. According to CompuCom, the purpose of a post-closing purchase price adjustment process is to serve as a "true-up 'to bring the accounts up to date to reflect the company's operations from [the agreement date] to the Closing Date.'" (D.I. 60 at 2) (quoting *In re Melun Indus., Inc.*, 898 F. Supp. 990, 993 (S.D.N.Y. 1990); *accord OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006)). Thus, the purpose of the post-closing purchase price adjustment process is not to determine whether the baseline purchase price agreed to by the parties at the time of signing was "the 'fair' sale price for the company." *In re Melun*, 898 F. Supp. at 994. Rather, the process assumes the accuracy of the baseline purchase price and determines the amount by which that purchase price should be adjusted to account for post-agreement changes in the value of the acquired company over the brief period between the signing and closing of the agreement. (D.I. 60 at 2-3) Given the limited nature of this inquiry and the typically small amounts involved, parties customarily agree - as did the parties here - to resolve post-closing purchase price

6

adjustment disputes in a "streamlined ADR proceeding." *Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E. 2d 667, 671 (N.Y. 2003). There seems to be no dispute that purchase price adjustment proceedings are generally characterized as encompassing narrow paradigms.

11. In this case, the parties agreed that the acquired companies would have a specific amount of Net Working Capital[6] as of the Closing Date, August 20, 2008. A component of Net Working Capital is inventory. As noted above, the parties disagree over the value of USACo's inventory and, in turn, the actual amount of the acquired companies' Net Working Capital, as of August 20, 2008. According to the Final Determination Report of KPMG, the sole issue submitted to KPMG for resolution was "the valuation of USACo's spare parts inventory, which [was] a component of Net Working Capital." (D.I. 46, ex. A at 1) KPMG described its role as limited to determining whether "the Proposed Purchase Price Calculation contained mathematical errors or whether the Proposed Purchase Price Calculation was calculated in accordance with the Purchase Agreement." (*Id.* at 6)

12. KPMG ultimately determined that, because CompuCom had not demonstrated that "the accounting for spare parts inventory using the historical estimate of a six-year useful life [was] unreasonable, consistency must prevail." (*Id.* at 24) In other words, "[i]n the absence of sufficient evidence to prove that Getronics' estimate of useful life was wrong, CompuCom, in calculating the Proposed Net Working Capital as at August 20, 2008, must utilize the six-year useful life to ensure apples to apples

---

[6]Commonly referred to as a "working capital peg."

7

comparison with the accounting principles, methodologies, procedures and classifications utilized in determining the working capital peg (including management's historical estimate and judgments supporting the amount of Net Working Capital)." (*Id.*)

13. In reaching this determination, KPMG concluded that "the accounting for spare parts inventory by Getronics [was] not in compliance with International Financial Reporting Standards," based on the fact that "IFRS does not provide prescriptive accounting for spare parts inventory." (*Id.* at 16) Nevertheless, because neither party objected to the use of the cap pool method of accounting for spare parts inventory, KPMG opined that, "unless you can prove an accounting error, a change in accounting estimate requires prospective application under IFRS." (*Id.* at 20) In reviewing the record to determine whether the six-year useful life estimate could be characterized as an accounting error, KPMG stated that the dispute, "in terms of the arguments put forth by the parties, turns on whether or not a six-year useful life for depreciating spare parts inventory is reasonable under IFRS." (*Id.*)

14. KPMG ultimately determined that a six-year useful life estimate was reasonable under IFRS. In so doing, KPMG addressed CompuCom's concerns about the change from a two-year to a six-year useful life estimate. KPMG observed in this regard that, while

> CompuCom has presented a compelling argument or, at a minimum, cast a shadow of doubt on Getronics' intentions surrounding the change [from a two-year to a six-year useful life], the weight of the evidence that has been presented is not sufficient to conclude that Getronics was managing earnings through the use of longer useful life estimates.

(*Id.* at 15) KPMG credited "Getronics' argument that the impact of the extension of the

8

useful life estimate would not have been significant enough to achieve any meaningful effect on earnings, EBITDA, etc." (*Id.* at 16) KPMG concluded that "there was sufficient support at the time for the change in estimated useful life assumption." (*Id.*) Despite its findings, KPMG was careful to note that "any determination as to the allegation of management of earning[s] and, therefore, fraud is a matter of law [which] should be decided by a court of competent jurisdiction and is[, therefore,] beyond the scope of this arbitration proceeding." (*Id.*)

15. As is evident from the record, the transaction was a complex one between sophisticated parties. The terms of the Purchase Agreement are clear and unambiguous, and must be interpreted according to their ordinary and usual meaning. The Purchase Agreement differentiates between the purchase price adjustment mechanism and the entirely separate representations and warranties made by the Sellers. (D.I. 6, ex. A, §§ 2.3(b)(ii), 3.3(a)) *See, e.g., Pentair, Inc. v. Wisc. Energy Corp.*, 545 F. Supp. 2d 917, 924 (D. Minn. 2008); *HDS Inv. Holding Inc. v. Home Depot, Inc.*, Civ. No. 3968-CC, 2008 WL 4606262, at *6 (Del. Ch. Oct. 17, 2008). The Purchase Agreement clearly anticipates that CompuCom may take legal action to enforce the representations and warranties. (*Id.* at § 8.6) KPMG, in its arbitral determination, likewise differentiated between its limited role under the purchase price adjustment mechanism and that accorded a court of law in determining whether CompuCom's allegations of fraud have any merit. (D.I. 46, ex. A at 16)

16. **Conclusion.** Under these circumstances, I conclude that the principles of

9

collateral estoppel do not apply.[7] The issue presented in the KPMG arbitration - whether a four-year or a six-year useful life estimate should have been used "in calculating the Proposed Net Working Capital as at August 20, 2008"[8] - is not the same as that presented in CompuCom's fraud claim - whether defendants "substantially overstated" the earnings of GNA "by tripling the useful life of [USACo's] spare parts from two years to six years in connection with a fraudulent scheme to manage earnings."[9] Indeed, KPMG emphasized that it was **not** deciding whether "the application of the six-year useful life was a prior period error," because such a determination "would impact the historical Financial Information and their compliance with IFRS. This in turn would imply a breach of representation[s] and warranties of the Sellers which, in our interpretation of the Purchase Agreement, mandates the indemnification provisions as the Exclusive Remedy afforded to the Parties." (D.I. 46, ex. A at 13) In sum, on this record, I decline to convert CompuCom's breach of warranty and fraud claims into ones that fall within the narrow scope of the purchase price adjustment mechanism.

17. The question that lingers, however, is what relevance, if any, do KPMG's analyses, observations and determination have in connection with the issues presented at bar. Despite my invitation to address this question post-argument, CompuCom failed to do so. (D.I. 60) Therefore,

---

[7]As a result, defendants' argument relating to damages (D.I. 46 at 19) is moot.

[8](D.I. 46, ex. A at 24)

[9](D.I. 40, ¶ 80)

IT IS FURTHER ORDERED that:

1. On or before **October 30, 2012**, CompuCom shall respond to defendants' post-hearing supplemental memorandum (D.I. 61) and the issues addressed therein.

2. Defendants may file a reply on or before **November 5, 2012.**

3. A telephonic scheduling conference shall be conducted on **November 19, 2012 at 4:30 p.m.**, with CompuCom's counsel initiating the call. **NOTE:** In this regard, I have not considered defendants' supplemental memorandum in connection with the pending motions to dismiss for failure to state a claim, given the sua sponte nature of the issues raised by the court and the lack of a substantive response by CompuCom. However, these issues should be discussed in terms of defining the scope and timing of discovery and in terms of a future motion practice.

United States District Judge

11